We will now move to Appeal No. 21-1539, Sam Stamey v. Forest River, and we will begin with argument for the appellant from Mr. O'Leary. Good morning, may it please the Court, Patrick O'Leary for Mr. Stamey. Mr. Stamey obviously appeals from a summary judgment on his constructive discharge claim while the District Court concluded that the work environment had become offensively hostile on account of age, the District Court concluded erroneously that his decision to quit was unreasonable as a matter of law. The District Court said, quote, he should have continued to work within the system, and specifically the District Court at the end of its opinion said, rather than seeking redress through quitting, he had the opportunity to turn swiftly to the plant manager once more to stop it, as he had done before, according to the Court Grant Summary Judgment on the Constructive Discharge Claim. We say that the District Court made the bar too high in this case, higher than what this Court did in Bumidi, which is our primary persuasive authority. Why do I say that? In the case of the female employee who was subject to anti-female remarks, women don't belong in the press room, they belong in flower shops, and so forth, she complained exclusively to a single member of the HR department, a Mr. Bell, and the opinion seems to imply that she did that multiple times. Now this Court didn't say your decision to quit once Mr. Bell complained was unreasonable because you didn't go to the plant manager, or you didn't go to the president, or you didn't file a charge of discrimination. This Court said that it was reasonable for her to quit once it became hopeless that human resources would not resolve her claim. Mr. O'Leary, can I ask you a factual question? Yes. I totally understand your argument. You are very articulate on the futility point. I totally get it. So, after Mr. Stamey's manager, Frank Pontius, after he died in early 18, and we get into the spring of 18, the record seems to show that the harassment continued and that's when the plant manager, what's his name, Mr. McDonald, called everyone together and said, or not everyone at the whole facility, but called some supervisors together and some co-workers, you can correct me in a second, and said this horseplay needs to stop. What I was focused on was the plaintiff quite clearly says, well it didn't stop. In fact, it continued and it escalated. The factual question I have is during that period of time, did he raise or re-raise his concerns to anyone at the company? Now, I know what you're going to say on futility. I get it that way, but just as a factual matter, what's the record show? The record shows that he says he complained, in his deposition he said he complained to Mr. Brady, his immediate supervisor, two or three times in his deposition. Okay, now when though? Well he said Mr. Brady became his immediate supervisor in mid-January of 2018 and he was quite clear on that timing because that was the date Mr. Pontius died and Mr. Pontius was his boss for ten years. So the jury could trust his memory and he was sketchy on some details. But about in that spring-summer of 18 how? Well he said Brady became his boss and he said initially Brady was in another building for two months and then they were joined and he said he complained to Brady two or three times. Now, we say it's a disputed fact whether there was ever an effort by Mr. McDonnell to get employees together and say stop this and we point to the fact that that's inconsistent with the company's position statement. Forest River spent more time devoted to Mr. Stammy's medical problems than explaining why if Mr. McDonnell had a meeting and got supervised together and so forth and so on, why that was omitted from the position statement. In my brief I mentioned that we have an opportunity to impeach by omission. If it happened, why didn't you say it? Another factual question for you, Mr. O'Leary. Yes, sir. With regard to harassment intending to harm the plaintiff physically, we have the spraying of the plate, we have the severing of the cord, the lamp cord. Are there other facts that you're pointing to in terms of harassment that would intend to harm the plaintiff physically? Well, there was the 55-gallon drum of what he called a flammable paint that suddenly appeared in his work area. And you may remember that one of the, if I can use the word pranks, I don't like that word, one of the pranks was that they had painted his lunch plate with paint. And so then a barrel shows up in his work area and he says it was a one-third full of flammable paint. So that's 18 gallons and paint's heavier than milk and a gallon of milk weighs 8 pounds. So you're talking about an object that weighs probably 200 pounds. He said that the top was off. He was concerned about it. I think the thing, on the physical, in fairness to the district court, this court said in Saros that slashing the employee's tires was not a physical threat, apparently because there was no evidence that the employee was present when the act was committed. And I think that's certainly generous to say slashing someone's tires is not a physical threat. It certainly is humiliating and it certainly is intimidating. And the standard here is physically threatening or humiliating and I think this court might want to consider adding intimidation. I think when you sneak into someone's work area and you cut the cord to a coffee pot, that's a violent act. And again, in a constructive discharge claim, the focus should be on what the victim perceived reasonably, not what the offender may have intended. So I think that's my comment on the physical threatening. The district court also called these things practical jokes, which I think is very generous to Forrest that they sabotaged his work area, they screwed shut his tool locker, and so forth. Would you like to reserve the rest of your time? Yes, Judge. Very good. Thank you, Mr. O'Leary. We're now going to move to argument from the appellee, Mr. Keene. May it please the court and good morning, Your Honors. John Keene for Forrest River Complaining was not futile at the time Sam Stamey quit. He placed a call to his supervisor, Mr. Brady, said, hey, I'm quitting. Could have left a message at that point describing how the harassment had gotten worse in his estimation after he filed his EEOC charge in June of 2018. But he didn't do that. He didn't tell Mr. Brady about the videos that he'd made, recording people making age-related comments to him. He never shared those with He could have talked to Mr. Brady when Mr. Brady called him back and said, Sam, you got your job. Come back to work. Mr. Stamey, there's no evidence in the record that he said anything about any comments at all. He had that opportunity to bring to light the comment that he says made him quit from a supervisor in a different area, not his supervisor, Larry Paraguay. Forrest River knew none of this at the time Mr. Stamey quit. He could have brought this up. Forrest River would have had an opportunity to address what Mr. Stamey now says were comments that were coming at him sometimes every hour of every day. There's nothing in this record showing that Forrest River knew the comments were that frequent. Some of the comments that were reported weren't even related to age. Is it your position as a legal matter that there must be that notice? In other words, you can't hypothesize any set of facts no matter how bad they are where a plaintiff could get to a jury on a constructive discharge claim without notice. So just come up with a parade of horribles involving co-worker conduct. What's your position on that legally? That would not be our position, Your Honor, and it's going to depend on the conduct. Where we have comments, the requirement to report what's going on I think is much more significant than in a case like Bailey v. Binion. In that case, the racial harassment was the owner of the company. There's no one else to complain to, and in that case, I can see certainly there's no obligation to try to tell somebody what was going on. Here, all we had left were comments. Mr. Stamey admitted that the practical joking stopped. He admitted that the sign in the bathroom was fixed after he filed the ZEOC charge. There's no evidence in the record he ever went back to Mr. Brady after talking with Mr. McDonald, and certainly after. In fact, he specifically denied going to any supervisor after he filed this charge. Counsel, you don't contest that the comments were something that were pervasive throughout the entire period Mr. Stamey complains of, right? So you're saying the practical jokes stopped, but the comments aren't something new that then popped up after the practical jokes stopped. The comments have been something he complained of from the beginning. Your Honor, I might take issue with the word pervasive because it has such an important meaning in Seventh Circuit, Title VII precedent. So I don't think they were pervasive before the June EEOC charge. When he says they amped up to this sort of daily or even hourly pace, he reported a handful of comments at most from December of 2017 until June of 2018. So in our position is they were not pervasive at that point. They were occurring. There were some comments, and a few of them are related to age. Many of them had nothing to do with age or anything else. They were FUSAM and things along those lines. So I would say if they were pervasive at any point, it was not until after he filed his EEOC charge, and that's exactly what he didn't tell Forrest River about. The thing that's a little bit hard to discern from the fact pattern is, maybe why there's a jury question, is you have these, if you want to call them practical jokes for discussion purposes, I mean, he didn't perceive them that way. All this stuff going on at his workstation, tying things together, spraying things, bringing the drum of paint, et cetera, et cetera. There are a whole bunch of comments that seem homophobic, that by their terms don't also have age in them. And then you have a whole bucket of age comments. Is it your position that we should keep them in three clean buckets and only focus on the age-related comments? I guess I would say this, Your Honor. At some point in this case, there was a Title VII claim when those homophobic comments were relevant. When pursuing an ADEA claim, I think we're focusing on the age-related comments. But even if we lump them all together and say it just made the workplace unpleasant for Mr. Stamey, he still needed to tell somebody about how frequently they were occurring. Because what happened up to that June EEOC charge doesn't come close to the standard required for a constructive discharge. I'd like to address, too, the cutting of the cord in the barrel. Mr. Stamey argues that there was some sort of risk of electrocution by the cord to his coffee pot being cut. I With respect to the barrel, there's no evidence in the record of who put it there or why they put it there. It was in his area. There's also his admission that the only reason he didn't move it is that it's because it wasn't his job. He said, I didn't put it there. It's not my job. He could have removed it himself. So I think those two things played really no role here, particularly the barrel, again, for which Mr. Stamey has presented no evidence that anyone put it there because of him or because of his age in particular. When you say that you don't view the cases all that close on it, can you identify a comparable case with facts as bad as these where we've not seen a jury question? What are the best couple candidates? Two best cases, Your Honor, are Porter v. Erie Foods and Gawley v. Indiana University. In Porter, the timeline was compressed, but the conduct was much more severe. The plaintiff found a noose hanging in his work area, brought it to the supervisor. The supervisor pins it up on her bulletin board so everyone can see it through a window. That continues to affect the plaintiff. At that point, the company holds an all-shift meeting and says, this has got to stop. And it did for about two days. But it resumed, and it got worse. And it got to the point where a locker fell over on the plaintiff while he was changing in the locker room and injured him. He didn't report that. He reported the earlier harassment and it got fixed, but he didn't report what happened after that. And that's what the court relied on when it affirmed summary judgment for the company. The other case, Gawley v. Indiana University, we had a supervisor. The conduct there was going on for more than a year, both of which conditions are much more significant than what we have here. There's evidence that the plaintiff asked the harasser to stop at least ten times, and she failed to disclose the most serious allegation where the supervisor not only had been making comments, but then proceeded to grope her breast when he was fitting her with a bulletproof vest. So this is Gawley with like a G? G-A-W-L-E-Y. Yes, Your Honor. Did you all talk about that in your brief? I didn't recognize it. That case is cited in the appellant's brief, actually. We did not discuss it in detail in our brief. Okay, I got it. And in that case, summary judgment was affirmed. Those are the two cases we can find that are closest on the facts here. And particularly Porter, where we're talking about a failure to report the most significant conduct before quitting. Court said it wasn't enough. Similarly here, it's not enough what Mr. Stamey did. He had the chance to come back and complain. Really, he had two chances, when he called to say he was quitting and when his supervisor called him to come back. And that offer to have him come back is significant. He could have at that point said, hey, can you transfer me out of there? There's no evidence he asked for a transfer. But that would have been a potential remedy that was never explored because he didn't report the comments to the extent that they were occurring. Didn't share any information about these videos he had made. Didn't tell anybody about what Mr. Paraguay had said to precipitate him leaving. And for that reason, he had opportunities. And the case law is clear. Resignation has to be the plaintiff's only course of action. And it wasn't that here. Thank you, Your Honors. Thank you, Mr. Keene. Mr. O'Leary, we'll go back to you for rebuttal. Responding first to Judge Scudder's question about the homophobic comments in the record. And I would argue that initially when we got the case, we looked at it through the lens of Title VII. But having considered the situation, it became apparent that Mr. Stammey is a 62-year-old camo-wearing, hard-drinking factory worker with a living girlfriend. It's implausible that his coworkers truly thought he was gay. And so, yes, Judge Scudder, there's no association between calling him a degenerate, homosexual lurking in a bathroom with age. But there was no association between race and slashing tires. And yet, in Saros v. Steel Tax, the court rightly considered the fact that among the events of racial epithets, someone had slashed his tires. So we say that that should be in the mix. Let me make clear that Mr. Stammey testified. Including all the workstation stuff, right? Oh, absolutely. It's all part of the same course of conduct. If slashed tires were in the mix in Saros, then everything else in Stammey should be in the mix here. Mr. Stammey's testimony was, and like many lay witnesses, he tends to construct a narrative more on incidents that were impactful than on specific dates. So, for example, he says the harassment resumed in mid-January, and I know that because that's when Mr. Pontius died and he was my protector and he had been with me for ten years. He testified. There was one date that Mr. Stammey was quite clear on, and that was the date that the homophobic slur in the bathroom was removed. And he testified that it had been up for three months. So if you back that up, you get into March. And he testified after he discovered the remark. That was the trigger that caused him to go to HR. That was the actual reason why he got his photographs together and went to Ms. Dubiksek's office. She wasn't there. He showed the photographs to the assistant. The assistant said, oh, that's disgusting. She gave him her cell number and he called her cell number and said, I'm being harassed. Call me back, and she never did. And then the next day, the plant manager showed up. And according to Mr. Stammey, did nothing but reprimand him for going to HR, turned around and walked off. Now, I go back to what I said earlier. This court said giving up once HR turned a complete deaf ear makes sense because HR departments are where an employee should take their concerns. You shouldn't take your concerns necessarily to a plant manager exclusively. HR departments are a function on policies and enforcing those policies. So this court said when Mr. Bell turned a deaf ear to Ms. Bumini and she quit, this court didn't say, well, you should have gone to the plant manager. You should have written a letter to the president. Thank you, Mr. O'Leary. Thank you, Judge. The case will be taken under advisement. Thank you, Mr. Keene, as well.